JENNIFER LEE TAYLOR (CA SBN 161368)
JTaylor@mofo.com
NICHOLAS HERRERA (CA SBN 301992)
NHerrera@mofo.com
ROBERT S. SANDOVAL (CA SBN 311032)
RSandoval@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Plaintiff
LAMBDA LABS, INC.

RIMON, P.C.
Karineh Khachatourian (SBN 202634)
karinehk@rimonlaw.com
Nikolaus A. Woloszczuk (SBN 286633)
nikolaus.woloszczuk@rimonlaw.com
2479 E. Bayshore Road, Suite 210
Palo Alto, California 94303
Telephone: 650.461.4433
Facsimile: 650.461.4433

Attorneys for Defendant,
LAMBDA INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| LAMBDA LABS, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>LAMBDA, INC.,<br><br>  Defendant. | Case No. 4:19-cv-04060-JST (TSH)<br><br>**JOINT LETTER BRIEF CONCERNING COMPLAINTS ABOUT LAMBDA SCHOOL**<br><br>Judge:   Magistrate Judge Thomas S. Hixson |

Per the Court's Order (ECF No. 69), the Parties submit this joint letter brief concerning complaints about Lambda School and related evidence. The parties met and conferred by telephone in good faith to resolve their disputes prior to filing this letter.

| Morrison & Foerster LLP | Rimon, P.C. |
|---|---|
| By: */s/ Jennifer Lee Taylor*<br>Jennifer Lee Taylor<br>Nicholas Herrera<br>Robert S. Sandoval<br><br>Attorneys for Plaintiff,<br>LAMBDA LABS, INC. | By: */s/ Karineh Khachatourian*<br>Karineh Khachatourian<br>Nikolaus A. Woloszczuk<br><br>Attorneys for Defendant,<br>LAMBDA INC. |

**Lambda Labs' Position**

Lambda Labs moves to compel responses to numerous requests for production[1] seeking documents related to Lambda School's reputation and complaints by its students. Such documents are commonly produced in trademark cases and are especially important here, where Lambda School has been the subject of negative press and received repeated complaints regarding its business conduct and the quality of its services. This negative attention has caused and will continue to cause irreparable harm to Lambda Labs and the goodwill it enjoys in its registered "Lambda" marks because Lambda School chose a confusingly similar mark that misleads the public into believing the two entities are connected when they are not. Complaints and other reputational evidence regarding Lambda School are thus relevant to demonstrate that Lambda Labs has lost control over the goodwill associated with its registered "Lambda" marks, which is relevant to establish irreparable harm for purposes of a permanent injunction.

Lambda School objects on the basis of relevance, the scope or breadth of the requests, and a number of privileges, immunities, and alleged "rights to privacy" it wrongly believes apply. The Court should overrule each objection and compel the requested discovery.

**Requests for Production**. Lambda Labs seeks discovery on four topics and explains the basis for each.

(1) Negative press attention (RFP Nos. 55-60): Lambda Labs seeks documents related to a series of articles criticizing Lambda School's business conduct and the quality of its services.[2] The articles appear in publications such as *New York Magazine*, *Business Insider*, and *The Verge*, and they disclose that (i) Lambda School is plagued with curriculum issues and has a significant number dissatisfied students and instructors; (ii) Lambda School has published false or misleading statistics regarding its student graduation rates and employment outcomes; and (iii) the "income sharing agreements" Lambda School students sign, in which they promise to pay a percentage of their future income to the school in lieu of upfront tuition, are harmful to students. These claims (and others) cause significant harm to the value of the "Lambda" name, which damages *Lambda Labs* even though it has no connection to Lambda School or the conduct detailed in the articles. Documents concerning these articles and the claims therein are relevant to demonstrate the irreparable harm Lambda Labs has suffered and will continue to suffer.

(2) Complaints by Lambda School students and employees (RFP Nos. 66-67 and 69-73): Lambda Labs seeks documents related to complaints by Lambda School students, graduates, employees, and contractors regarding the quality of Lambda School's services and the Lambda School experience. (RFP Nos. 66-67.) Lambda Labs explained in meet and confer that its focus

---

[1] (*See* Ex. 1, Lambda Labs' Second Set of Requests for Production to Lambda School, RFP Nos. 55-62, 66-74, and 77-101.)

[2] *See, e.g.*, "Lambda School's Misleading Promises," *New York Magazine*, https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-thanclaimed.html (Feb. 19, 2020); "The High Cost of A Free Coding Bootcamp," *The Verge*, https://www.theverge.com/2020/2/11/21131848/lambda-school-codingbootcamp-isa-tuition-costfree (Feb. 11, 2020).

in discovery is on complaints that might affect the goodwill associated with the "Lambda" name, not every complaint that Lambda School may receive on any topic. Relevant categories would include the poor quality of services, curriculum, and instructors, problems with career placement, and the controversial "income share agreements" that students sign, among others.[3]

Lambda Labs also seeks documents related to a Twitter account, "@LambdaScam," which has posted extensive criticism about the school (RFP No. 69) and documents related to specific problems and unrest at Lambda School that have been reported in the press, including students who requested to cancel their "income sharing agreements" and be absolved from future payments to Lambda School due to the poor quality of education (RFP No. 70), and efforts by students to organize to collectively seek redress from the school regarding their complaints (RFP Nos. 71). Lambda Labs also seeks documents related to two students involved in these events: Bethany Surber and Tyler Nishida. (RFP Nos. 72-73.)

(3) Potential misrepresentations regarding graduation/employment rates (RFP Nos. 61-62, 68, 74, 77-80, 84-97, and 101): Lambda School publishes periodic "student outcome reports" that provide information on its graduation rates, graduate employment rates and prospects, and related matters.[4] *New York Magazine*, *Business Insider*, and *The Information* have all published articles accusing Lambda School of making misrepresentations and misleading claims in its "student outcome reports" and elsewhere. Lambda Labs thus seeks documents concerning Lambda School's claims regarding student graduation and employment rates (RFP No. 84), including draft student outcome reports and any data and information underlying statements on these topics (RFP Nos. 85-97), as well as information on reasons students drop out, which bears on the accuracy of reported graduation rates (RFP No. 68). Further, Lambda Labs seeks copies of an internal Lambda School memorandum apparently provided to the press[5] that suggests Lambda School inflated its publicly reported student employment statistics. (RFP Nos. 61-62.)

Lambda Labs also seeks documents related to audits of Lambda School's outcome reporting, including audits by and discussions with the Counsel on Integrity in Results Reporting (CIRR), an outside reporting organization with whom Lambda School previously worked on student outcome reports. (RFP Nos. 77-80.)

Finally, Lambda Labs seeks documents related to a specific student (Antonio Melendez) who Lambda School prominently features in its outcome reports as a Lambda School success story, even though Mr. Melendez earned a four-year Computer Science degree *prior* to attending Lambda School. Lambda Labs seeks documents related to Mr. Melendez (RFP No. 74) as well

---

[3] Lambda Labs cannot provide an exhaustive list of potential relevant complaints because it is not sufficiently familiar with the Lambda School program, but Lambda School should be able to identify potentially relevant complaints through key word searches in custodial collections.

[4] *See, e.g.*, Lambda School Outcomes Report, H1 2019 Cohorts, Released Q1 2020, https://drive.google.com/file/d/1jHPCA0GrsbtM98JkmEwRTQiXGJ22RQie/view.

[5] *See, e.g.*, "Lambda School, a buzzy online coding bootcamp backed by big Silicon Valley names, could be placing far fewer graduates in jobs than it says," *Business Insider*, https://www.businessinsider.com/lambda-school-graduation-placement-rate-2020-2 (Feb. 19, 2020).

as documents disclosing the number of other students who earned Computer Science degrees before completing the Lambda School program (RFP No. 101).  Such documents bear on Lambda School's claim that these students obtained employment *because of* Lambda School, and might undermine Lambda School's claim that Mr. Melendez, and other similarly situated graduates, are representative of the employment prospects for Lambda School graduates.

(4) Companies who employ Lambda School students (RFP Nos. 81-83 and 98-100): Lambda Labs seeks documents related to the companies who employ Lambda School graduates, including documents to identify those companies (RFP No. 81), documents related to any Lambda School "hiring partnerships" with those entities (RFP Nos. 82-83), and documents related to one specific hiring partnership with a company called Divvy, which Lambda School references in its student outcome reports (RFP Nos. 98-100).  These documents may yield more evidence of misrepresentations regarding student employment, as well as evidence that the Lambda School students who obtained employment with these "hiring partnership" companies are not representative of typical students' employment chances because the decision to hire those students was influenced by a "sweetheart deal" between Lambda School and the company.[6]

These documents are also relevant to identify a key population of potentially confused consumers: technology companies who may hire Lambda School graduates *and* who are also target consumers for Lambda Labs' goods and services.  A mistaken belief among these entities that the parties are associated with one another would be important evidence of infringement and would be especially harmful to Lambda Labs.  This is not a "new" relevance explanation, as Lambda School wrongly claims below, but is one of the primary drivers that has justified these requests throughout discovery.  Indeed, these requests receive *more* support as discovery proceeds: Lambda Labs recently found documents evidencing that Lambda School's *partner* Divvy confuses Lambda Labs and Lambda School.

**Lambda School's Objections Are Meritless**.  Lambda School raises four categories of objections to the above requests: (1) relevance, (2) scope and overbreadth, (3) privilege, and (4) "right of privacy."  Lambda Labs addresses each in turn.

(1) Relevance.  Lambda School claims that the documents Lambda Labs seeks are not relevant because there are no trademark dilution claims.[7]  This is not the law.  Evidence of an infringer's reputation is relevant in *all* trademark cases because a showing that a trademark owner lost control over its mark due to a mistaken association with an infringer can establish irreparable harm, particularly when there are quality issues with the infringer's goods or services.  As Professor McCarthy explains: "If it is likely that confused persons will mistakenly attribute to *plaintiff* defects or negative impressions they have of *defendant's* goods or services, then the *plaintiff's* reputation (and its signifying trademark) is at risk because it is in the hands of a

---

[6] For example, the outcome report mentioning Mr. Melendez further discloses in fine print that Lambda School is a customer of the company that hired him, Divvy.

[7] *See, e.g.*, Lambda School's Objections and Responses to RFP Nos. 55-62, 66-70 ("Lambda School also objects to this Request to the extent that it is irrelevant to the allegations set forth in Plaintiff's Amended Complaint since it did not allege trademark dilution or tarnishment.")  Note that tarnishment is a *type* of trademark dilution, not a separate claim.  15 U.S.C. § 1125(c).

stranger." McCarthy on Trademarks and Unfair Competition ("McCarthy") § 30:46.

The loss of the ability to control one's mark and reputation is one of the primary harms caused by trademark infringement, and is considered irreparable. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) ("'Evidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm,' so long as there is concrete evidence in the record of those things." (quoting *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)); *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) ("Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners. Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control. A trademark owner's loss of the ability to control its marks, thus, creates the potential for damage to its reputation.").

Moreover, courts also consider evidence that an infringer sells an inferior product or has garnered a poor reputation in finding that a mark owner is suffering irreparable harm through mistaken association with the poorly-reputed infringer.[8] *See, e.g.*, *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1184-85 (E.D. Cal. 2016) (relying in part on argument that infringer's lower-quality beer harmed goodwill in plaintiff's superior product to find irreparable harm); *IHOP Franchising, LLC v. Hameed*, 2015 WL 429547, at *5 (E.D. Cal. Feb. 2, 2015) (deficient restaurant operator, whose franchise agreement was terminated due to failed health inspections but who refused to cease using the "IHOP" mark, "irreparably harm[ed] IHOP by removing its ability to control its reputation"); *Anhing Corp. v. Thuan Phong Co. Ltd.*, 2015 WL 4517846, at *23 (C.D. Cal. July 24, 2015) (infringer caused irreparable harm to plaintiff's ability to control own brand by selling competing product of "inferior quality"); *cf. Collins v. United States Dep't of Veterans Affairs*, 2020 WL 133889, at *3 (S.D. Cal. Jan. 13, 2020) (irreparable harm may be present where consumers "gain[] a negative impression of Plaintiffs' organization or would refuse to use Plaintiffs' services as a result of the confusion").

Reply regarding relevance objection. When the parties conferred prior to filing this motion, Lambda School said it would withdraw its relevance objection should Lambda Labs identify authorities demonstrating that reputational documents are relevant in trademark cases. Lambda School claimed to have researched the issue thoroughly and was convinced of its position that the documents are not relevant. But Lambda School did not withdraw its objection in response to the authorities cited above. Instead, it changes tactics and attacks Lambda Labs' *motives*, claiming that Lambda Labs improperly seeks to paint Lambda School as a "bad actor"

---

[8] A plaintiff is not required to prove that an infringer has a *poor* reputation to obtain injunctive relief—only that the plaintiff is experiencing irreparable harm by losing control over its mark and reputation. *Brooklyn Brewery Corp.*, 156 F. Supp. 3d at 1185 (loss of control over one's mark "is an injury, *even though the borrower does not tarnish it*, or divert any sales by its use" . . . . (emphasis added)). But evidence that an infringer *is* viewed negatively is strong evidence of the plaintiff's loss of control over its marks. *See* McCarthy § 24:15 (while the "trademark owner need not prove [the] junior user's goods or services are inferior," "[i]f the goods or services *are* inferior, this increases the injury that the trademark owner could suffer if there is a likelihood of confusion." (emphasis added)). Lambda School misapprehends this point in its section below.

and put its business model "on trial," which is wrong—Lambda Labs merely seeks relevant discovery. It also invents new requirements for "relevance" that exist nowhere at law.

*First*, it invents a distinction between "public" and "non-public" reputation evidence,[9] and argues in essence that Lambda Labs is only entitled to rely on evidence of Lambda School's reputation which has been reported in the press. There is no such distinction. A mark owner is not harmed only by complaints about an infringer that are widely reported, but also by complaints that occur in person, on private social media, or elsewhere. To that end, courts hold that trademark plaintiffs are irreparably harmed on the basis of interactions that Lambda School would dismiss as "non-public."[10] So-called "internal" documents regarding complaints may also bear on Lambda School's *response* to them, which is relevant to show the degree to which Lambda Labs is being harmed by the mistaken association. To the extent Lambda School fails to sufficiently address complaints, that failure increases the harm to Lambda Labs. Lambda School is also wrong that these cases turn on whether the infringer's negative features are "publicly visible"—that distinction appears *nowhere* in the cases, and is obviously incorrect because courts frequently rely on facts (such as the storage temperature in the restaurant's refrigerator in *IHOP*, 2015 WL 429547, at \*5, for example) which are not "visible" to the public at all.

*Second*, Lambda School wrongly claims that information about its reputation is only relevant if the parties are "in the same market" or if they sell similar products. Not true. Lambda School suggests the cases cited above support this argument, but they do not even discuss it. Lambda School also blithely suggests that the parties are not in the same market and do not offer similar goods and services because Lambda Labs sells "supercomputers" while Lambda School is a school. Also not true. Lambda Labs sells a variety of computers, including *student* laptops and *student* software licenses. In any event, the fact that many people *confuse the parties*—including companies who may have relationships with both, such as Divvy—demonstrates that they are "in the same market" for purposes of this discussion.

Finally, Lambda School's concerns that it will be harmed by producing such documents is easily addressed by designating the materials confidential under the Protective Order.

(2) <u>Scope and breadth</u>. Lambda School stated lengthy boilerplate objections to the scope and supposed overbreadth of each request,[11] but agreed during meet and confer that they could be resolved by an agreement on the search terms to be used to identify potentially relevant

---

[9] Lambda School cites only on a mistaken idea of "common sense" as its basis for this claim.

[10] The internal reports the Court relied on in *IHOP Franchising, LLC*, 2015 WL 429547, at \*5, to show the restaurant operator's poor performance were not widely-reported "public" documents.

[11] (*See, e.g.*, Lambda School's Objection to RFP No. 55 ("Lambda School objects to this Request on the grounds that it is vague, ambiguous, overbroad in time and scope, and therefore, unduly burdensome and oppressive, particularly the terms 'All,' 'documents,' 'communications,' and 'relating to' as they are vague, indefinite, ambiguous, and fails to describe the information sought with the required reasonable particularity, without limitation to specific subject matter, and is calculated, or would operate to annoy, embarrass, oppress, or unduly cause expense to Lambda School.").)

documents. Lambda School appears to have withdrawn that agreement by objecting in its section below to requests that seek "all" documents on a given topic.[12] In any event, Lambda Labs maintains that any concerns about the scope or breadth of its requests can be resolved through the use of targeted search terms and by the other discovery limits that are in place, such as the parties' agreement to only search a limited number of document custodians. Lambda Labs remains open to meeting and conferring about the scope of any particular request, but that discussion will not be productive until the Court resolves the relevance issue.

(3) <u>Privileges</u>. The Court should overrule Lambda School's unexplained objection on the basis of "the common interest privilege, or any other applicable privilege, protection, or immunity" because Lambda School did not identify any basis for such privileges, protections, or immunities in its responses.[13] When Lambda Labs specifically inquired about the basis for its common interest objection during meet and confer, Lambda School refused to provide any information other than stating that a "joint defense agreement" exists between it and an undisclosed person or entity. This unsubstantiated claim, which cannot even be tested by the Court or Lambda Labs, cannot justify withholding discovery, particularly when Lambda School is the *only* defendant. Lambda School now suggests for the first time below that it has a "common interest" with its students and employees to "protect their privacy rights," but that claim again has no support and should be overruled by the Court.[14]

(4) <u>"Right of privacy."</u> Lambda School also includes boilerplate objections that Lambda School seeks "documents that are subject to a right of privacy under state and federal laws." But it never identified any such right of privacy in meet and confer (except to refer vaguely to the U.S. and California Constitutions), and it still identifies no basis for this "privacy" claim below.

Lambda School may not refuse to produce relevant discovery based on an unsupported "right of privacy" for its students and employees that it has never explained to Lambda Labs or to the Court. Again, if Lambda School has concerns that certain relevant documents in this case should not be made public, it may designate those documents as confidential under the Protective Order—but it may not simply refuse to produce them. Likewise, if there are specific documents that raise privacy concerns, such as a student falling on hard times, Lambda Labs is open to discussing how to handle those—but Lambda School may not refuse to search for or produce *any* documents about *any* students because sensitive documents *might* exist. Lambda School also raises hypothetical concerns about the scope of future discovery, including potential third party subpoenas and depositions of Lambda School students who possess relevant information. But Lambda School may not refuse to produce relevant discovery now based on unripe speculation about the scope of *future* discovery.

---

[12] Lambda School also relies on cases that found "a decade's worth" or more of discovery to be overbroad, but Lambda School has no comparable concerns because it was founded in 2017.

[13] Lambda Labs does not take issue with Lambda School relying on the attorney-client privilege or the attorney work product doctrine.

[14] It is not clear whether this "common interest" with its students is the "joint defense agreement" disclosed during the parties' meet and confer, or whether this is a separate agreement that Lambda School is relying on as a basis to withhold documents.

**Lambda School's Position**

Labs' motion makes clear that it seeks to harass School by placing its business model on trial under the pretext of reputational discovery.  Labs cannot cite a single case that justifies its sweeping requests that call for irrelevant, private and sensitive personal information of School, its students and employees.  On its face, Labs' RFPs seek discovery on non-public information, most having nothing to do with "reputational" discovery.   Labs concedes that it does not *need* any evidence of School's reputation.  What matters is not what is said internally at the School, or whether a student had a complaint about School's registration process, reasons students withdraw, student qualifications, or whether School's placement numbers are accurate.  Labs unabashedly revealed in meet and confer that it will subpoena School's students and employers to ask them about their experiences with the School and personal aspects of academic, financial, and career achievement. Labs seeks this discovery not to delve into School's purported bad reputation but to try and prove it.  If Labs was right, it would open the door to all types of discovery in trademark cases such as hiring, environmental, labor and manufacturing practices.  This is not the law.  To the extent Labs has any need to define School's reputation, what matters is School's public reputation.  *See, e.g., Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1107 (C.D. Cal. 2003) (trademarks are "merely the symbol[s] by which the public recognizes … reputation….").  Yet, Labs' RFPs are all targeted at School's internal documents and communications—which have no influence on School's public perception.  Labs' portion is frustrating because it assumes rather than shows that everything sought by the RFPs is relevant and proportional.  Labs simply dismisses School's arguments rather than addressthem.

Labs does not cite any authority permitting such sweeping discovery into a defendant's business practices.  Rather, the authorities Labs provides stand for the proposition that a plaintiff can demonstrate irreparable harm with evidence that the defendant's goods or services are lower quality than the plaintiff's *in the same market*.  *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1184-85 (E.D. Cal. 2016) (granting injunction based on suggestion that consumers were "unsatisfied" with the quality of defendant's beer in lawsuit involving beer makers); *IHOP Franchising, LLC v. Hameed*, 2015 WL 429547, at *5 (E.D. Cal. Feb. 2, 2015) (granting injunction based on evidence of defendant restaurant's substandard health conditions for a franchise IHOP whose license was revoked ); *Anhing Corp. v. Thuan Phong Co. Ltd.*, 2015 WL 4517846, at *23 (C.D. Cal. July 24, 2015) (granting injunction based on testimony from only two individuals that defendant's rice noodles were lower quality than plaintiff's).  During meet and confer, School never agreed to withdraw its relevancy objection.  School suggested that if Labs provided cases on point, School would seriously consider them.  Not only did Labs say at meet and confer that it had not gathered any such cases, it never provided any and still doesn't.  None of these cases concerned a defendant whose general business practices had "garnered [them] a poor reputation."  And each of these cases are distinguishable from here where the parties' goods and services are highly unrelated.  Labs is primarily seeking evidence regarding School's overall business reputation, not evidence of the quality of School's services.  Allowing a trademark plaintiff to seek discovery to try to build a case that the defendant *should* have a poor reputation would turn every trademark case into a sideshow of mudslinging.

School is built on an educational model that increases access to education and provides an alternative to costly traditional higher education.  School is proud of the opportunities and services it provides its students.  Between School's innovative approach to education and its

high-profile as a Silicon Valley startup, it is no surprise that it has attracted media attention. But the boundaries of trademark discovery are not set by the happenstance of media coverage. The articles that Labs cites did not "open the door" for overwhelming broad discovery into matters that have nothing to do with the likelihood of confusion determination at the heart of this case. The discovery Labs seeks fails the proportionality requirements of Rule 26(b) as the RFPs seek irrelevant material, are overbroad, would invade the privacy interests of thousands of School students and employees, unnecessarily prolong the discovery phase of this case and would foist immense burden and costs on School. School, therefore, cross-moves for a protective order pursuant to Rule 26(c)(1)(A) to protect School's present and former students and employees from the potential embarrassment from the disclosure of their highly personal student and employee files, documents, and communications and shield School from undue burden.

RFP Nos. 55-60—Press Attention Regarding Lambda School: RFPs 55-60 concern articles written about Lambda School. Labs argues that it needs "*[a]ll* documents and communications relating to" the articles to demonstrate irreparable harm. Labs' argument is that the articles have negatively impacted School's *public reputation*, which ultimately injures Labs' goodwill. But a plain reading of the RFPs is that Labs wants School's *internal* documents which cannot influence School's public reputation (negatively or positively), so they have no bearing on irreparable harm to Labs. By definition, and according to common sense, only publicly available information can influence public reputation. Labs argues that *IHOP* supports it entitlement to internal, non-public documents. But the two documents in that case were relied upon *because* they revealed *publicly-visible* failures, such as unsanitary customer restrooms and unsafe food handling that would affect the public diners. *IHOP*, 2015 WL 429547, at * 5. *IHOP* does not stand for the proposition that a trademark infringement plaintiff may seek broad discovery to prove that the defendant has a bad reputation. *IHOP* is also distinguishable because the plaintiff obtained the evidence itself, and there was complete overlap in the parties' market of breakfast restaurants. Further, Labs asserts that the allegedly "negative attention" from the articles has *already* "caused and will continue to cause irreparable harm to Labs and [its] goodwill…." Thus, Labs already has the evidence, the articles.

Additionally, Labs claims that these RFPs seek documents not just about the articles, but also about "the allegations therein." But a critical article about School does not "open the door" for Labs to take discovery into the so-called "allegations." Indeed, Labs' request is an overreach as the articles cumulatively touch on nearly every aspect of School's business from inception to the present. Labs is asking this Court for discovery into *all* of Lambda School, presumably for the purposes of assessing the accuracy of the articles' "allegations." This would be unheard of in a trademark case—and Labs does not cite to a single case where similar discovery was allowed. Labs cannot take a few pieces of journalism and leverage them into the right to put Lambda School on trial for issues that have absolutely nothing to do with whether School infringes Labs' trademarks. What Labs is asking for is the ability to take whatever discovery it wants in pursuit of making an argument that School is a bad actor. But this is not the correct inquiry.

RFP Nos. 61-62, 68, 74, 77-80, 84-97, and 101—Graduation/employment rates:  Similar to the articles discussed above, Labs relies on articles that have questioned School's student outcome reports ("SOR") and tries to leverage them into extraordinarily broad discovery into anything even tangentially related to the SORs. These **twenty-three** RFPs, which typically request "***all*** documents and communications," touch on everything from audits of outcome

reports (RFP 77), to disassociation from a reporting agency (RFP 80), to anything School has *ever* said about student outcomes (RFP 84), to ***anything*** related to the calculations/methodology/verifications/drafts regarding the outcome reports (RFPs 86-93), to the identities of graduates and withdrawn students (RFPs 95-97), to the job data for graduates (RFP 94). Labs' argument is that it wants to test the representations in the SORs. But School's statistical analyses are not on trial here. Similarly, Labs even seeks ***all*** documents and communications regarding one student, Antonio Melendez, simply because Labs says he was featured as a Lambda School success story and he holds a Computer Science degree (RFP 74). Labs apparently believes it can hold a trial on whether Mr. Melendez's success is "representative of the employment prospects for Lambda School graduates." Labs is using discovery even to undermine any positive press School receives. Presumably, Labs seeks this discovery because it wants to try to prove that School has a negative reputation that could hurt Labs' goodwill. But for the same reasons explained above, the articles themselves are the only relevant evidence. Labs' RFPs are aimed at proving the articles' allegations, which does not matter.

These RFPs are also far overbroad. First, the RFPs seek ***all*** documents and communications. Second, RFPs 77-80 and 84-92 seek essentially ***any and all*** documents or communications relating in any way to School's preparation, calculation, methodology, data collection, audits, or drafts of SORs. Even if Labs needed *something* regarding the SORs, it does not need the vast scope it seeks. Third, RFP 68 seeks "***all*** documents and communications relating to any students who have withdrawn from School ***and*** their reasons for doing so." This scope is incredible as it seeks essentially the ***entire*** student file for anyone who has withdrawn from Lambda School, and is not limited to dissatisfied students. There is no justification for such an extreme invasion of such former students' privacy. Student files necessarily contain sensitive personal identifiers and information and Labs makes no showing of a compelling need for these documents. "'In the context of discovery of confidential information in personnel files,… discovery will not be permitted until a balancing of the compelling need for discovery against the fundamental right of privacy determines that disclosure is appropriate.'" *Newell v. County of San Diego*, No. 12-1696, 2013 WL 1932915, *2 (S.D. Cal. May 8, 2013) (quoting *Liberty Mut. Ins. Co. v. Cal. Auto. Assigned Risk Plan*, 2012 WL 892188, *3 (N.D. Cal. March 14, 2012)); *see also In re Remec, Inc. Sec. Litig.*, No. 04CV1948 JLS (AJB), 2008 WL 11338378, at *3 (S.D. Cal. July 28, 2008). And School is *not* raising this issue here for the first time, School told Labs during its two-hour meet and confer that School shares a common interest with its students and employees to protect their privacy rights and asserted this privilege in its RFP responses. And since School's students are located worldwide, School will have to conduct survey of laws to ensure compliance with each jurisdiction. And a protective order is of only limited value when it comes to personal privacy because Labs intends to depose these students. A protective order does not protect them from any personal embarrassment. Labs' suggesting that all of School's privacy concerns can be waved away because of the protective order without more does not give the Court a sufficient basis to overrule School's objections.

Similarly, RFP 74 seeks ***all*** documents and communications concerning Antonio Melendez, yet Labs cannot provide any reason, much less a compelling one, to invade his privacy with discovery into *every* communication or document about him. Finally, RFPs 95-97 seek identification of nearly two hundred former students. And while mere identification might not be an invasion of privacy, Labs stated in meet and confer that it intends to subpoena former students for deposition, so Labs' intrusion is already in the planning stages as it intends to put

School's students and graduates through "trial" over their performance at School and in the job market. School's students did not provide their personal information to be disclosed in this lawsuit. Labs' tries to dance around its subpoena threats by calling it "speculation," but confirms the accuracy by not denying any of it. Labs surely cannot subpoena and depose thousands of students, particularly considering this Court's advisement that the parties do not have "all the time in the world" to complete discovery. ECF 72. These RFPs are simply not justified.

<u>RFP Nos. 81-83 and 98-100—Companies who employ Lambda School students</u>:

RFPs 81-83 and 98-100 seek a broad swath of documents concerning (1) identification of any company who has *ever* hired a School graduate (RFP 81); (2) any company that has entered into or even *discussed* a "hiring partnership" with School (RFPs 82-83); and (3) any documents or communications having anything to do with a specific company, Divvy, that is in a "hiring partnership" with School (RFPs 98-100). To justify these RFPs, Labs resorts to rank speculation, suggesting that the documents "***may*** yield more evidence of misrepresentations regarding student employment, as well as evidence that the School students who obtained employment with these 'hiring partnership' companies are not representative of typical students' employment chances" (emphasis added). Labs provides no evidence of its speculation of a "sweetheart [hiring] deal" with Divvy made for the first time in this letter brief. Again, School's business and marketing statements are not on trial, and the *only* possible thing relating to these issues that matters to Lab's irreparable harm claim is the public's perception of School. The opinions of the limited subset of School's employees and students is not indicative of public perception. Rather, it's the perception of Labs' customers that matter. Further, Labs does not explain what evidence, exactly, it might find from an identification of all companies who have ever hired a Lambda School graduate, as that would prove nothing about alleged misrepresentations. Nor can Labs explain why it needs ***all*** documents and communications with companies who entered, or considered entering into a "hiring partnership" with School.

Perhaps cognizant of its own deficient explanations, Labs veers into an entirely new explanation; that the information could identify companies who may hire School graduates and who are also Lab's target customers. Labs suggests that this could uncover evidence of infringement if any of those companies believed there was an association between the parties. But an identification of such companies would not even establish this, as Labs would have to subpoena and depose those companies one-by-one to obtain what would likely be testimony of questionable value as the graduates themselves are not accused of infringement. Moreover, if any potential customer contacted School to buy Labs' products, that information is responsive to other RFPs that School has agreed to produce. It is far-fetched to think that a company's hiring of someone from a school would then cause them to make a mistaken association between the school and a company that sells super computers. But Labs has said in meet and confers that it intends to subpoena companies that have hired School graduates, further indicating that Labs is pursuing a fishing campaign designed to harass and drive up costs.

Finally, these RFPs are also overbroad and fail the proportionality requirement of Rule 26(b), as Labs refused School's request to narrow their scope. Labs now argues for the first time that these RFPs can be narrowed through search terms, but that suggestion rings hollow. Using the search term "Divvy" or "complaint" or "feedback" for example, will not narrow anything. If Labs wanted to narrow its RFPs, it had an independent responsibility to do so, which it did not.

Likewise, RFP 82-83 together seek **all** documents and communications concerning "hiring partnerships" with any employer or even *potential* employer of School students or graduates. The scope is not even targeted at the alleged "misrepresentations" that Labs claims it is interested in.  Similarly, RFPs 98-100 seek **all** documents, communications, and contracts between School and Divvy, without any limitation on subject matter or an explanation from Labs as to why such an overwhelming scope of discovery is needed into this particular relationship. Divvy, for example, provides corporate credit cards to the School's employees.  Certainly, even Labs must concede that, given the relationship, "[a]ll documents relating to Divvy" is overbroad.

<u>(4) RFP Nos. 66-67 and 69-73—Complaints by Lambda School students and employees:</u>

Labs claims that these RFPs are focused on complaints regarding the quality of School services that might affect Labs' goodwill.  But they are not so limited.  RFPs 66-67 request "***all*** documents and communications concerning *feedback* or complaints" from any Lambda School employee, contractor, student, or graduate.  Further, RFPs 70-73 neither mention "complaint," nor limit the request to such matter.  And Labs did *not* limit the scope in meet and confer. Lambda School asked as an example if a student complaint about having trouble registering for a class would be within the scope, Labs affirmed that it would.  Nor did Labs limit its RFPs to student/graduate complaints, yet Labs does not explain how a Lambda School employee's workplace complaints could injure Labs' goodwill.  Or how School's internal documents and communications about a third-party Twitter gripe account that is currently inactive could either. The broad scope of these RFPs would encompass patently irrelevant subject matter such as technical support issues, complaints about another student's behavior, or forgotten passwords.

But even if Labs had limited these RFPs to complaints about the quality of School's services, it would be to no avail.  If School sold supercomputers that competed with Labs, complaints about School's supercomputers could be relevant.  That is, if School sold an inferior supercomputer, consumers confused about the parties' relationship or identities could associate School's quality with Labs, thereby damaging Labs' goodwill.  But this case is nowhere near that scenario.  School offers educational services to students seeking to make a career change.  And Labs sells very expensive machine learning computers, cloud computers for machine learning, and related software.  For the first time, Labs claims it sells student laptops, with prices starting at ***$3,300***.  Labs' Complaint identifies its customers as Fortune 50 companies in the artificial intelligence field, there is no mention of students.  ECF 1, ¶ 8. In any event, customer overlap is not market overlap, the parties goods and services do not compete in any way.  And of course complaints alone are not dispositive.  Labs broad RFPs are seeking the disposition of those complaints, whether good or bad.

Further, Lab's theory of irreparable harm from internal student or employee complaints is so unlikely that it can be dismissed on its face.  For a student complaint to lead to any harm, the complaining student would need to be (1) a prospective purchaser of Labs' supercomputers (2) confused about the school it attended for several months; and (3) make the complaint public. But, pursuing such a theory is not what Labs wants this discovery for.  In meet and confer, Labs has admitted that it intends to sift through student complaints to look for disgruntled former students to depose.  Again, this is a harassment campaign.  And Labs tacitly admits this, claiming that it does not even *need* to establish that School has a bad reputation, "only that Lambda Labs has lost control over its ability to control its own reputation."

Even if Labs could establish the right to a limited subset of student complaints, and it cannot, its RFPs are far overbroad.. *See, e.g.*, *Pertz v. Heartland Realty Inv'rs, Inc.*, No. 19CV06330CRBTSH, 2020 WL 1496931, at *1 (N.D. Cal. Mar. 27, 2020) (denying motion to compel where RFP sought "a decade's worth of complaints about anything, no matter how irrelevant to the case"). As noted, RFPs 66-67 concern both "feedback" (whether positive, negative, or neutral) and complaints without restriction to subject matter. RFP 70 seeks ***all*** documents and communications concerning any student requests to cancel their income sharing agreements, without any restriction for requests due to dissatisfaction with School's services. RFP 71 seeks ***all*** documents and communications regarding purported student efforts to "organize," but student organization is neither inherently nor exclusively related to complaints about quality. Broad discovery requests like Labs' are consistently denied or limited when the scope far exceeds any possible relevance, even where the other party's case or pleading raised the issue. *See, e.g.*, *Hardin v. Mendocino Coast Dist. Hosp.*, No. 17CV05554JSTTSH, 2019 WL 1493354, at *4 (N.D. Cal. Apr. 4, 2019) (denying discovery into "a decade and a half of [plaintiff's] mental health records" despite her claim for emotional distress; *Powell v. Wells Fargo Home Mortg.*, No. 14-CV-04248-TSH, 2018 WL 4660287, at *2 (N.D. Cal. Sept. 28, 2018) (limiting discovery into plaintiff's entire medical history despite emotional distress claim).

Further, RFPs 72-73 request ***all*** documents and communications relating to two specific students, Bethany Sturber and Tyler Nishida, without any restriction to their purported complaints about School's educational services. Further, these students' complaints are already well documented in an article Labs cites to from *The Verge*. Labs cannot explain what further information it needs, much less why it should get ***all*** documents and communications about them. Although Labs belatedly claims it only wants complaints related to harm to its goodwill, it cannot help itself and in a footnote concedes that the RFPs have no limits.

Finally, many of these RFPs run afoul of the privacy rights of School's students and employees, as explained above. For example, RFPs 66-67 seek any "feedback" from employees or students, this overbroad and generic term would undoubtedly ensnare communications that include personal information. Even worse, RFP 70 seeks ***all*** documents and communications concerning students seeking to cancel their income sharing agreements. Without any limitations, this request would include the highly personal information regarding students who have no complaint about School, but have simply fallen on hard times for any number of reasons. Moreover, Labs' requests call for employment information, including personal performance.

In view of the extraordinary scope of these RFPs, the burden on School to locate, review, and produce all student and employee "feedback and complaints" would be exceptionally high. As an example, Labs is seeking production of voicemails. A review of voicemails for "feedback or complaints" would be an enormous task requiring audial review of all of School's voicemails as they are not organized by subject matter. Likewise, given the personal nature of the information sought, School would have to carefully review these documents for responsiveness, redactions, and scope particularly since some of Lambda's students are located internationally and would not be relevant to a US trademark infringement suit. As with the RFPs discussed above, RFPs 66-67 and 69-73 also seek irrelevant subject matter and fail the proportionality test of Rule 26(b). Lambda School respectfully requests that this Court deny Lambda Lab's motion to compel and grant Lambda School's cross-motion for a protective order to protect it from undue cost and burden as well as its students and employees' privacy rights.

## **ATTESTATION**

  I, Jennifer Lee Taylor, am the ECF user whose credentials were utilized in the electronic filing of this document. In accordance with Civil Local Rule 5-1(i)(3), I hereby attest that Karineh Khachatourian concurred in the filing of this document.

                */s/ Jennifer Lee Taylor*
                Jennifer Lee Taylor