
JENNIFER LEE TAYLOR (CA SBN 161368)
JTaylor@mofo.com
NICHOLAS HERRERA (CA SBN 301992)
NHerrera@mofo.com
ROBERT S. SANDOVAL (CA SBN 311032)
RSandoval@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Plaintiff
LAMBDA LABS, INC.

RIMON, P.C.
Karineh Khachatourian (SBN 202634)
karinehk@rimonlaw.com
Nikolaus A. Woloszczuk (SBN 286633)
nikolaus.woloszczuk@rimonlaw.com
2445 Faber Place, Suite 250
Palo Alto, California 94303
Telephone: 650.461.4433
Facsimile: 650.461.4433

Attorneys for Defendant,
LAMBDA INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| LAMBDA LABS, INC.,<br><br>      Plaintiff,<br><br>    v.<br><br>LAMBDA, INC.,<br><br>      Defendant. | Case No. 4:19-cv-04060-JST (TSH)<br><br>**JOINT LETTER BRIEF CONCERNING SCOPE OF DISCLOSURE OF LAMBDA LABS' HIGHLY CONFIDENTIAL DOCUMENTS TO DR. WEBER**<br><br>Judge:    Magistrate Judge Thomas S. Hixson |

The Parties submit this joint brief concerning the scope of disclosure of Lambda Labs' highly confidential documents to Lambda School's proposed expert witness, Dr. Lynne Weber. The parties met and conferred by telephone in good faith to resolve this dispute before filing this letter.

Morrison & Foerster LLP

By: */s/ Jennifer Lee Tayor*
Jennifer Lee Taylor
Nicholas Herrera
Robert S. Sandoval

Attorneys for Plaintiff,
LAMBDA LABS, INC.

Rimon, P.C.

By: */s/ Karineh Khachatourian*
Karineh Khachatourian
Nikolaus A. Woloszczuk

Attorneys for Defendant,
LAMBDA INC.

**Lambda Labs' Position**

  Lambda Labs brings this motion to prevent unlimited disclosure of its highly confidential, attorneys' eyes only ("AEO") information[1] to Lambda School's disclosed expert witness, Dr. Lynne Weber, who provides business consulting services to various technology companies, in addition to serving as an expert witness.  (Ex. 1 (Dr. Weber's CV).)  Lambda Labs is an AI infrastructure company who competes with a number of other technology companies in a nascent field.  Lambda Labs does not seek to prevent Lambda School from retaining Dr. Weber for this matter or to prevent her from seeing *any* of its AEO information.  Rather, because Dr. Weber provides consulting services in an industry Lambda Labs serves, has had clients in the same industry, and may have future engagements in the industry, Lambda Labs seeks to ensure that disclosure of its AEO information is targeted and proportionate to her needs, as mandated by the Protective Order.  (ECF No. 56 ¶ 7.4(c).)  To that end, Lambda Labs asked Lambda School to explain the scope of Dr. Weber's expert needs, but it refused.  Lambda Labs also proposed a compromise to address both parties' interests, which Lambda School rejected.  Lambda Labs therefore asks the Court to institute one of its proposals to prevent unnecessary disclosure of its highly confidential AEO information to Dr. Weber, absent which Lambda Labs' business interests may be harmed through the ordinary course of Dr. Weber's regular consulting work.

  Background.  Dr. Weber performs substantive business consulting and advisory work outside of the litigation context, including self-described "strategic value advisory" (Ex. 1 at 3) and "strategic planning" (*id.* at 4).  She also provides "confidential professional services on non-dispute matters," including "market analysis/market research" and "strategic consulting."  (*Id.* at 6.)  She provides these services in a broad array of industries, including "high tech (hardware, software, apps, and services)."  (*Id.*)  During meet and confer, Lambda School confirmed "Dr. Weber has had confidential/privileged non-litigation engagements with software companies that provide software solutions in the data AI/machine learning/data analytics space."  (Ex. 2 at 5.)

  Standard.  If a party in this matter objects to disclosure of AEO information to an expert witness, "the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert."  (ECF No. 56, Stipulated Protective Order ¶ 7.4(c).)

  Argument.  In light of Dr. Weber's strategic advising work, Lambda Labs believes that an unlimited disclosure of its AEO information to Dr. Weber may result in future harm to its business.  To be clear, Lambda Labs is not concerned about intentional violations of the Protective Order.  Rather, it is concerned that highly confidential AEO information Dr. Weber

---

[1] Lambda Labs' produced AEO materials include, but are not be limited to, sensitive business strategy and planning documents, corporate financial records, pricing and supply chain information, product specification documents, and related internal communications.  Under Protective Order ¶ 7.2(d), Dr. Weber is already permitted to access to materials designated as "Confidential" but not AEO, and the objection procedure under Protective Order ¶ 7.4 expressly limits objections to AEO information.  Lambda School's claims of "pivots" makes clear that it misapprehends the purpose of meet and confer, which is to resolve and distill issues before presenting them to the Court, as happened here.

learns about Lambda Labs and its strategy from reviewing Lambda Labs' business strategy documents, internal pricing or supply chain discussions will become part of Dr. Weber's knowledge base, just as any professional's work forms his or her knowledge base. Because Dr. Weber provides strategic consulting services to technology companies, she is likely to provide such services to Lambda Labs' competitors, business partners, or customers who may have interests adverse to Lambda Labs, and to rely on a knowledge base that includes AEO information she learned about Lambda Labs. Thus, there is a real risk that Lambda Labs may be competitively disadvantaged as a result of AEO information Dr. Weber receives in her capacity as an expert witness for this case. For that reason, Lambda Labs seeks to reduce the risk of potential business harm by limiting the disclosure of its AEO materials to Dr. Weber to only those necessary for her anticipated expert opinion. Lambda Labs' request to prevent Dr. Weber's unlimited access to AEO information is no different from the Protective Order's prohibition on access to that same information by party representatives who may be involved in competitive decision-making or business matters. This safeguard exists for a reason, even though the parties are otherwise bound by the Protective Order not to use any disclosed information for any purpose other than prosecuting the litigation.

To resolve these concerns, and because the Stipulated Protective Order requires a balancing of the parties' interests, Lambda Labs asked Lambda School to explain its "need to disclose the Protected Material to its Expert" (ECF No. 56 ¶ 7.4(c)). It refused. Lambda Labs first asked about Dr. Weber's intended role, as this information would shed light on the scope of her "need" to review AEO materials and could help the parties reach a compromise about the materials she may view. Lambda School claimed that information is privileged. Lambda Labs then proposed an alternate course, asking Lambda School instead to identify the documents or categories of documents it wishes to disclose to Dr. Weber, so Lambda Labs can assess if it has any concerns about disclosure of those materials. Lambda School insisted Dr. Weber should be allowed to view *all* of Lambda Labs' documents, but still refused to explain why such broad disclosure is necessary.

Given Lambda School's refusal to explain its "need" and its rejection of the reasonable "safeguards" (ECF No. 56 ¶ 7.4(c)) proposed above, Lambda Labs objects to the unlimited disclosure of its AEO materials to Dr. Weber. Lambda Labs remains open to either of its earlier proposals: (1) Lambda School explains Dr. Weber's intended role in this case, so her "need" to view AEO materials can be properly evaluated, or (2) Lambda School identifies the documents it wishes to disclose to Dr. Weber, so Lambda Labs can evaluate if it has any business concerns over the disclosure of those documents.

<u>Reply to Lambda School's section</u>. Lambda Labs does not seek to inject undue delay or to bar Dr. Weber from viewing *all* of its protected information, as Lambda School wrongly suggests below. Rather, Lambda Labs made clear weeks ago it would approve Dr. Weber to review certain protected materials as long as the scope of disclosure is limited to materials she *needs*, as the Protective Order contemplates. But Lambda School refused to provide any information on Dr. Weber's "need," and still refuses below. Its statement that Dr. Weber will be its "expert on trademark issues" obfuscates her role when the case at hand is a trademark dispute. It is unclear why, as a "trademark" expert, Dr. Weber would need *unlimited* access to the opposing party's AEO information if her expert assignment is, as Lambda School suggests, to conduct a consumer confusion survey based on Lambda Labs' public trademark uses and

promotional materials. Lambda School's further suggestion that Dr. Weber may need documents to identify Lambda Labs' "competitors, customers, business plans, advertising or distribution channels" is not an argument in favor of *unlimited* disclosure, but instead supports targeted disclosures on those issues, consistent with Lambda Labs' proposal for Lambda School to identify specific documents or categories of documents it wishes to disclose to Dr. Weber. Lambda Labs has never sought to exclude Dr. Weber as an expert in this case, and only seeks information to allow it to evaluate potential concerns over the disclosure of its AEO materials.

Lambda School raises a series of red herrings that do not address Lambda Labs' objections. It refers to the parties' prior discussion of Dr. Weber's confidential client names, but Lambda Labs no longer seeks that information. It also suggests this dispute can be resolved if it obtains a list of Lambda Labs' "competitors," but providing such a list would not resolve the dispute, both because Lambda School is not representing that Dr. Weber would agree to refrain from future consulting for such companies (nor has Lambda Labs made that request) and because Lambda Labs' concern extends to her future strategic consulting work for its business partners and customers as well. Lambda Labs does not assume any intentional wrongdoing by Dr. Weber, but it wishes to reduce the risk of potential harm from unnecessary disclosures. And Lambda Labs does not suggest that the Protective Order has inadequate safeguards; the "need" balancing test *is* the adequate safeguard. Lambda School refuses to provide information required to make it effective.[2]

Lambda School also cites inapposite case authorities in which the objecting parties sought to prohibit disclosures of any kind to the proposed experts, or the party seeking disclosure established a specific need for the expert to view protected information. *See, e.g., Advanced Micro Devices, Inc.*, 2017 WL 3021018; *Codexis, Inc.*, 2017 WL 5992130; *Verigy US, Inc.*, 2008 WL 4183493. Neither is the case here. Finally, Lambda School complains that Lambda Labs designated its entire production as protected material, which is not true. And if it believes documents are over-designated, the Protective Order has process to address such issues. Given this process, its sweeping complaints, raised for the first time below, merit no consideration.

---

[2] Lambda School also misreads an irrelevant section of the Protective Order barring depositions of non-testifying experts who do not provide reports (ECF No. 56 § 7.4(d)) to claim it is somehow prevented from discussing the scope of Dr. Weber's need for protected information, even though the prior section requires a discussion of Dr. Weber's need.

**Lambda School's Position**

Without any supporting caselaw, Labs has used the Protective Order (Ex. 4 and "PO") to block School's expert. Over the last month Labs has raised serial objections, pivoting each time School provided further information. Labs concedes it does not have any specific objection to Dr. Weber, but rather its concern is that Dr. Weber *could* unintentionally or inevitably put Labs' confidential information at risk. Labs has the burden to establish the threshold issue of harm given the PO's safeguards. Labs' position is that if Dr. Weber performs strategic consulting in the *same industry* as Labs, it could cause Labs harm. Labs vaguely defines its industry as "AI infrastructure" and yet has no issue with Dr. Weber's disclosed litigation engagements for companies such as Apple and Google. Rather, Labs proposes that School disclose the scope of Dr. Weber's engagement and the documents it wishes to show her on an ongoing basis so that Labs can "evaluate" whether *it* thinks that School has a need to disclose information to Dr. Weber. The PO contemplates no such process and is not intended to be used by any party as a shield and a sword. Nor does Labs identify who its competitors, business partners, or customers of concern are and now suggests *for the first time* that in order for Weber to gain access to its AEO materials, she must agree to refrain from working for Labs' unnamed competitors in the future. And in an attempt to distinguish School's cases, Lab's pivots again and *for the first time,* limits its objection to AEO materials. Given Labs' over-designation, this is a distinction without a difference. Dr. Weber's confidential non-litigation strategy consultancies have concluded. All non-litigation confidential consultancies Dr. Weber has participated in the last five years that involved data analytics have concluded and were in niches that Labs does not do business in, such as software for voice response analytics and banking data. Labs has not been identified to or by Dr. Weber as a competitor in the areas in which she has performed such consulting work. School provided Labs with all this information but Labs unreasonably continues to block Dr. Weber's access.

Background. Weber is an experienced expert witness, appearing before courts in this District, and works for one of the largest and most established consulting-services companies in the United States. School disclosed Dr. Weber pursuant to the PO on November 10th. Ex. 1. Dr. Weber has not, to her knowledge, ever been denied access to another party's confidential information pursuant to a PO. Labs' initial objection was that School's disclosure was missing information because it did not disclose the names of Dr. Weber's confidential clients. *Id.* But the PO permits experts to withhold the names of such clients. PO at ¶ 7.4(a) n.1. Labs then pivoted and asked for the names of Dr. Weber's confidential consulting clients in the "high tech (hardware, software, apps, and services)" industries despite the PO's explicit prohibition. Ex. 2. School provided Labs with additional non-confidential information about Dr. Weber's engagements to alleviate Labs' concern that Dr. Weber might have worked in Labs' industry. And School repeatedly asked Labs to provide the names of its competitors. *Id.* But Labs refused. School also confirmed with Dr. Weber that none of her current litigation and confidential matters are focused specifically on selling hardware or services in the AI/data analytics space. *Id.* Further, School confirmed that while Dr. Weber has had confidential non-litigation engagements with companies that provide software solutions in the data AI/machine learning/data analytics space in the past, there is no subject matter overlap with Labs. *Id.* In fact, Labs is a hardware company that builds "super computers" using third party offerings.

Despite all this information, Labs again pivoted and claimed that Dr. Weber's "strategy consulting" work was a problem because Dr. Weber could hypothetically take on similar work in the future for a Labs competitor. *Id.* Based on this speculation, Labs insisted that School describe the litigation work that Dr. Weber would be doing so that Labs could evaluate School's need. *Id.* Labs' request is explicitly prohibited by ¶ 7.4(d) of the PO, which is not "irrelevant" as Labs claims, because Dr. Weber has not yet been disclosed as a testifying expert. Finally, Labs pivoted again only *after* receiving School's portion of this letter brief to drop Labs' objection to Dr. Weber's access to "confidential" documents. Ex. 3. Labs' month-long series of pivots suggest that its objection is gamesmanship.

Standard. Labs misrepresents the PO standard of review. "The Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert." The PO contemplates that the risk of harm is disclosure to competitors. PO at ¶ 7.4(c). Courts faced with this issue have only considered prohibiting disclosure if the objecting party shows, ***in the first instance***, a risk of subsequent disclosure, such as to a competitor. *See, e.g., Advanced Micro Devices, Inc. v. LG Elecs., Inc.*, No. 14-CV-01012-SI, 2017 WL 3021018, at *2-3 (N.D. Cal. July 17, 2017) (considering prohibition only if "a proposed expert's work in the field creates a substantial risk of misusing the information") (citation and quotation marks omitted); *Codexis, Inc. v. EnzymeWorks, Inc.*, No. 3:16-CV-00826-WHO, 2017 WL 5992130, at *6–8 (N.D. Cal. Dec. 4, 2017) (objecting party must first establish the risk of harm), *aff'd and remanded*, 759 F. App'x 962 (Fed. Cir. 2019), and *vacated on other grounds*, No. 3:16-CV-00826-WHO, 2019 WL 5257936 (N.D. Cal. Aug. 22, 2019); *Verigy US, Inc. v. Mayder*, No. C07-04330RMWHRL, 2008 WL 4183493, at *1 (N.D. Cal. Sept. 8, 2008) (objecting party failed to demonstrate that disclosure to competitor was likely). Labs does not dispute that the cases School cites held that the objecting party has the initial burden of establishing a risk of harm. And Labs' contention that School's caselaw is "inapposite" because of a minor factual distinction fails. The holdings of these cases did not turn on (or even consider) whether the objecting party was blocking only AEO or all confidential materials or on "specific need." Finally, Labs fails in its attempt to analogize an expert's "unlimited" access with the PO's prohibition on access for party representatives. The PO contains no such prohibition. Likewise, the PO permits unlimited numbers of School's in house counsel to review AEO materials without vetting or prohibition. PO at 7.3(b).

Argument. Labs' theory of potential harm is that because Dr. Weber provides strategic advising work, Labs could be "competitively disadvantaged" if Dr. Weber later consults for a "Labs' competitor, business partner, or customer who may have adverse interests to [Labs]." But courts have held that such speculation is insufficient grounds for an objection. *Codexis*, 2017 WL 5992130 at *6 ("An objection should not be sustained on the grounds that an expert will inevitably misuse [the confidential] information if he consults for [the disclosing party's] competitors in the future …. This would effectively give a party the power of veto over its adversary's choice of experts.") (citation and quotation marks omitted.). Further, none of Dr. Weber's work suggests that she is likely to undertake consulting work for any such unnamed entities. Labs strains to manufacture a tenuous connection by arguing that Dr. Weber consults "in an industry ***served*** by [Labs]" and that Labs "has had ***clients*** in the same industry." Labs does not explain how this poses a risk to Labs. Indeed it does not appear to be a real concern of Labs, as Dr. Weber's list of recent casework reveals that she has done work for numerous

technology companies such as Apple, who is one of Labs' customers. Moreover, the PO provides Labs with explicit protections. First, the PO bars an expert from disclosing protected material and provides consequences for PO violations including "sanctions and punishment in the nature of contempt." Second, the PO requires notification if a party's expert becomes employed or engaged by a competitor. PO at ¶ 7.4(c). Labs' refusal to name its competitors indicates that it is not genuinely concerned about competitive harm.

Although the PO does not require School to describe the work that Dr. Weber will perform, School's need for its expert to have access to protected materials is real. Labs' assertion that School refused to provide any information about Dr. Weber's intended work is false. Labs already knows that Dr. Weber is School's expert on trademark issues. School must defend itself against Labs' trademark claims, which centers on the likelihood of confusion analysis. An expert could provide analysis or opinions in this area by measuring the degree of market competition between the parties, which might require reviewing information about the parties' competitors, customers, business plans, advertising or distribution channels. *See, e.g.*, McCarthy on Trademarks and Unfair Competition § 23:2.75 (5th ed.) Likewise, one would expect an expert would need information about each party's customers to design a trademark survey. *See, e.g.*, McCarthy § 32:159 (5th ed.). Labs does not dispute that School has adequate reasons why Dr. Weber needs access to Labs' designated materials. Rather, Labs argues that it should be given direct insight into what work Dr. Weber will be doing so that it can "evaluate potential concerns." Labs has the order all wrong; Labs needs to ***first*** articulate tangible concerns if it wishes to block disclosure. And despite its claim to the contrary, Labs *has* designated all of these types of information as protected materials under the PO, even public materials. In fact, Labs has designated its *entire* production as protected material. Even having pivoted and limited its objection to AEO materials, that still includes over 3,000 documents and suggesting that School seek de-designation creates unnecessary side litigation and is impracticable under the current schedule. Further, if Labs' expert relies on its designated materials in his/her report, Dr. Weber would be prevented from reviewing it in its entirety, which is particularly troubling given Labs' over designation. Opening reports are due March 8, 2021. Any further delay will have an impact on School's ability to prepare for trial. Should Labs' request be granted, School will be forced to seek an extension of the current case schedule. In light of the above, Labs' objection should be summarily overruled.

## ATTESTATION

I, Jennifer Lee Taylor, am the ECF user whose credentials were utilized in the electronic filing of this document. In accordance with Civil Local Rule 5-1(i)(3), I hereby attest that Karineh Khachatourian concurred in the filing of this document.

*/s/ Jennifer Lee Taylor*
Jennifer Lee Taylor